NOTICE
Decision filed 08/17/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220209-U

NO. 5-22-0209 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* S.L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-105 |
| | ) | |
| Samantha M., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

NO. 5-22-0210

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* I.L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-106 |
| | ) | |
| Samantha M., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

1

JUSTICE MOORE delivered the judgment of the court.
Justices Wharton and Vaughan concurred in the judgment.

## ORDER

¶ 1    *Held*:    The judgments of the circuit court of Marion County that found the respondent unfit and that terminated the respondent's parental rights are affirmed because the circuit court's finding that the respondent was unfit, based on failure to make reasonable progress, was not against the manifest weight of the evidence.

¶ 2    In this consolidated appeal, the respondent, Samantha M., appeals the judgments of the circuit court of Marion County that found her unfit as a parent, and found it in the best interests of the respondent's biological minor children S.L. and I.L. to terminate the respondent's parental rights. The respondent raises one issue on appeal, which is whether the State met its burden to prove by clear and convincing evidence that the respondent is unfit. For the following reasons, we affirm.

¶ 3    I. BACKGROUND

¶ 4    This case began with the filing of, *inter alia*, petitions for adjudication of wardship regarding the two minor children at issue in this case: S.L., who was born in September of 2009 (circuit court case No. 18-JA-105, petition filed on November 28, 2018), and her brother, I.L., who was born in October of 2014 (circuit court case No. 18-JA-106, petition filed on November 29, 2018). The petitions alleged that the children's father (V.L., who is not a party to this appeal) engaged in a sexual act with S.L., and that V.L.'s paramour, who also lived in the household, had pending cases with the Illinois Department of Children and Family Services (DCFS) and therefore legally could not be left in charge of the children. The petitions alleged that the respondent, who is the children's mother, resided in Pittsburgh, Kansas.

¶ 5    On December 12, 2018, counsel was appointed to represent the respondent. On January 3, 2019, service plans that were dated December 12, 2018, were filed for each child. The plans noted

2

that integrated assessments for the children were scheduled for January 18, 2019, and that the respondent, who had stated that she wished to have the children live with her in Kansas, was to participate in the assessments. Also on January 3, 2019, a parent child visitation and contact plan was filed for the respondent and the two children. The plan was dated December 12, 2018, and allowed the respondent to visit the children one time per month for four hours.

¶ 6     On January 9, 2019, a report was filed by Caritas Family Solutions (Caritas) that indicated that the respondent had not yet visited with the children, but planned to after a hearing on that date. The report stated that the respondent lived in Kansas with her three other children, currently was involved with family preservation services as a result of four reports against her in December 2018 for physical abuse and neglect, which subsequently were determined to be unfounded, and was receiving intact services in Kansas. On January 25, 2019, ahead of a scheduled January 30, 2019, pretrial hearing, Caritas filed a second report, which indicated that the respondent engaged in a supervised visit with the children on January 9, 2019, as planned, that "[t]he visit went very well" with "no concerns noted," and that the respondent planned to participate in another supervised visit after the January 30, 2019, hearing. The report noted that the respondent had not yet completed her integrated assessment because the respondent was not in Illinois on the date it was scheduled to take place, but that the respondent would be doing so in the near future. On February 11, 2019, a DCFS integrated assessment with clinical screener was filed. It did not include detailed information about the respondent, because she still had not participated in an integrated assessment. However, the assessment noted that the respondent had visited with the children only one time—on January 9, 2019—since the case began, and had "not been consistent in her contact with" caseworkers. Thus, the assessment stated that with regard to the respondent, "the prognosis for reunification in a timeframe meaningful to [the children] (5-12 months) is guarded."

3

¶ 7     On March 27, 2019, ahead of a scheduled April 3, 2019, pretrial hearing, Caritas filed a new report, which indicated that the respondent still had visited with the children only on January 9, 2019, but that she did call or video chat with the children via V.L. during his visits with the children. The report also indicated that the respondent was going to receive a packet by mail to complete part of her integrated assessment, with the remainder to be completed by phone, and that the respondent had advised her children that she was pregnant again. On April 3, 2019, a DCFS family service plan dated February 3, 2019, was filed, which reflected "[u]nsatisfactory [p]rogress" on the respondent's part with regard to completing her integrated assessment.

¶ 8     On April 23, 2019, amended petitions for adjudication of wardship were filed on behalf of each of the children, due to new concerns related to V.L.'s paramour. No allegations against the respondent were presented in the amended petitions. Also on April 23, 2019, Caritas filed a report dated April 15, 2019, which indicated that it was prepared for use at an April 24, 2019, hearing, and indicated that the respondent had not yet returned the packet that was sent to her to begin her integrated assessment process. On May 17, 2019, Caritas filed a report dated May 15, 2019, which indicated that it was prepared for use at a May 22, 2019, dispositional hearing. The report did not specifically reference the respondent's progress with regard to an integrated assessment, but stated that Caritas recommended that the respondent "complete parental services and mental health counseling." The report stated that the respondent indicated that she was "willing to complete parenting classes but that she did not see a need for her to be engaged in mental health counseling." The report continued that the respondent stated "she would do whatever she needed to do in order for her children to be returned." The report noted that the respondent had a supervised visit with the children on April 24, 2019, and was scheduled to have one on May 22, 2019. A separate section of the report that listed and summarized the supervised visits of both the respondent and V.L. with

4

the children stated that there were no concerns noted with regard to the respondent's April 24, 2019, visit.

¶ 9    At the May 22, 2019, dispositional hearing, the respondent testified, *inter alia*, that she had lived in Kansas most of her adult life, and presently lived in Fort Scott, Kansas with, *inter alia*, her boyfriend and three of her children. She testified that she presently received services from the state of Kansas to help "maintain a healthy environment for the children." She testified that in Illinois, it had been recommended that she receive parenting services and mental health counseling. When the respondent was asked what she had done "with regard to those recommendations," she testified as follows:

> "I have already seen a therapist. There was no—I can't think of what the word is. But there is no—we didn't have to go any further with that. And the parenting classes, Fort Scott does not have services for parenting classes. So I'm going to get with my Family Preservation worker and see if maybe there is something in Pittsburgh which is 30 minutes away from Fort Scott or maybe see about getting some online classes."

¶ 10    When asked if she had received a mental health assessment, the respondent testified that she had, and when asked where, she testified that she "went to SEK Mental Health" in Fort Scott. She testified that no counseling was recommended for her as a result of the assessment. When asked if she had a plan for what she would do for S.L. and I.L. if they came to live with her in Kansas, the respondent testified that she would make sure S.L. continued to get counseling, and that I.L. got whatever services were needed to help him. She testified that services were available very near her home, within a short walking distance.

¶ 11    When questioned by the State, the respondent conceded that she currently lived in a two-bedroom apartment with a total of nine inhabitants. When asked if she had done "anything" with

5

regard to getting parenting classes, the respondent testified that she "just found out that [she] had to do parenting classes today." When asked if she had been in contact with her caseworker in Illinois, the respondent testified that they texted "[o]nce or twice a week." She testified that prior to the children being removed from V.L.'s care in this case, she "had a lot" of contact with them, which mostly consisted of video chats facilitated by V.L. When asked if she thought she needed mental health counseling, the respondent testified that she did not. When asked why, she testified that she believed she was doing fine raising her children without it. When asked if mental health counseling was recommended for her, she testified that it was, and added, "I went to the intake appointment. There was no recommendation[ ] after that."

¶ 12    When questioned by the guardian *ad litem* (GAL), the respondent testified that legally, prior to DCFS initiating this case, she and V.L. had joint custody of S.L. and I.L. She testified that she sent them to live with V.L. in Illinois shortly before their divorce was finalized, approximately two years ago. When asked if she believed it showed "good judgment" to let the kids live with V.L., the respondent testified that she believed it did at that time, because she had a full-time job then, and a total of five children to try to take care of. She conceded that she knew both S.L. and I.L. had "special needs," but thought V.L. could provide for them, because V.L. was on disability at that time and therefore had time to get services for them. When asked, she reiterated that she did not believe she needed mental health counseling. She conceded that I.L. had issues that made him "a very hard kid to handle."

¶ 13    Following the respondent's testimony, the GAL argued that, in light of the trauma S.L. and I.L. had undergone, it was "absolutely in their best interest that custody and guardianship be with [DCFS] and that they be wards of this Court." She further argued that both parents needed "to work on the service plan," because the kids had serious issues. The State agreed. Counsel for the

6

respondent argued that the children should be allowed to live with the respondent in Kansas, because the respondent had testified that she would ensure their many needs were met there. V.L.'s counsel agreed.

¶ 14   Thereafter, the trial judge stated that she had "considered the testimony of [the respondent], the recommendation of the [GAL,] and the dispositional report," and concluded that it was in the best interests of the children for them to be placed in the custody and guardianship of DCFS. She stated, *inter alia*, that "these children need a level of care that neither parent, including mom, can provide at this point given how they have been traumatized." In a written order entered that day, the trial judge ruled that the respondent was "unable to care for [the] minors with her current living conditions."

¶ 15   On June 18, 2019, Caritas filed a report that indicated that the respondent visited with the children on May 22, 2019. On August 22, 2019, Caritas filed a report that indicated that it was prepared for use at a permanency hearing scheduled for August 28, 2019, and that indicated that the respondent was not working, due to a high-risk pregnancy, but was looking for larger living quarters. The report indicated that on August 20, 2019, the respondent reported that she was not participating in mental health counseling because she did not like leaving her children with other people. The report indicated that a Kansas caseworker had informed Caritas that the respondent received a mental health assessment, and that thereafter no follow up treatment was recommended, but that Caritas had not yet received written documentation of this from the Kansas caseworker, despite "multiple" requests for it. The report indicated that the respondent was attending parenting classes "every Thursday night" and a "Mother to Mother Ministry." The report stated that a representative of the Mother to Mother program indicated that the respondent "arrives on time, completes her homework, and 'seems to really be taking in the information.' " The report indicated

7

that the respondent had attended the program on August 8, 2019, and August 15, 2019, and was expected to attend on August 22, 2019.

¶ 16    Following the August 28, 2019, permanency hearing, the trial judge entered a written order in which she set the permanency goal as "return home 12 months," but which did not include any findings as to whether the respondent, or V.L., were making progress.

¶ 17    On November 6, 2019, Caritas filed a report that indicated that it was prepared for use at a status hearing scheduled for November 13, 2019, and that indicated that Caritas still had received no written documentation regarding the respondent's purported mental health assessment, but that the respondent was still attending parenting classes, and in fact had provided certificates of completion from Mother to Mother Ministry on September 7, 2019, and on November 5, 2019. The report also indicated that the respondent had completed a fourth supervised visit with the children, on August 28, 2019, and that the foster mother to the children allowed them to call the respondent "occasionally."

¶ 18    On November 27, 2019, a DCFS family service plan dated November 15, 2019, was filed. Although the plan contended that V.L. had "not made any progress throughout the life of this case," it noted that the respondent had "completed two parenting classes and found a bigger apartment for the children to be returned to," and that the respondent had "also been compliant with the Kansas Family Preservation (Intact) Services." Elsewhere, the plan noted the fact that the respondent still had not provided written documentation of receiving her mental health assessment, and the plan specifically listed the respondent's progress on this item as "[u]nsatisfactory," but stated that once Caritas received such documentation, "this rating will change."

¶ 19    On February 7, 2020, Caritas filed a report that indicated that it was prepared for use at a permanency hearing scheduled for February 12, 2020, and that indicated that Caritas still had

received no written documentation regarding the respondent's purported mental health assessment, but that Caritas had contacted SEK Mental Health, which had indicated that the respondent would have to sign a release, and had contacted the respondent, who stated that she would sign a release. The report also stated that due to the respondent's "compliance with the service plan, [Caritas had] started the paperwork for the Interstate Compact Process" so that a home study could be completed in Kansas. Following the February 12, 2020, hearing, the trial judge entered a written permanency order that stated that the permanency goal remained "return home within 12 months," and that specifically noted that the respondent had "made substantial progress toward" the goal, while V.L. had not.

¶ 20    On May 15, 2020, Caritas filed a status report that was dated May 5, 2020, and indicated that it was prepared for use at a status hearing scheduled for May 20, 2020. The report indicated that the respondent was "in need to complete her mental health assessment and follow up with their recommendations." The report thereafter stated that Caritas recommended that the respondent, "per her service plan to complete parenting services, obtain a mental health assessment and follow recommendations." The report noted that a new Caritas caseworker had taken over this case, and that when she asked the respondent about mental health services on May 1, 2020, the respondent stated, "I wasn't told I needed a mental evaluation." The report indicated that the new caseworker "encouraged her to work towards obtaining this assessment to be in compliance with her service plan," and that the caseworker was going to send the respondent "an updated service plan."

¶ 21    On July 27, 2020, Caritas filed a report that was dated July 15, 2020, and indicated that it was prepared for use at a permanency hearing scheduled for July 30, 2020. The report indicated that Caritas did not believe placement of the children with the respondent was appropriate, due in

9

part to the respondent's "lack of engagement in mental health counseling," particularly in light of recent issues both children were having. The report indicated that on July 20, 2020, the respondent told her Caritas caseworker that she had completed her mental health assessment, but that when the caseworker checked with SEK Mental Health, they informed her that on March 27, 2019, the respondent "met with a therapist for an inquiry but did not complete an assessment." The report indicated that SEK Mental Health planned to contact the respondent "to re-engage her," and that the Caritas caseworker attempted to contact the respondent on July 22, 2020, but had not yet heard back from her.

¶ 22    A permanency hearing was held via Zoom on July 29, 2020. At the hearing, the respondent's counsel stated that although the respondent previously had "indicated that she completed a mental health assessment," in fact, the records that were obtained from Kansas show that the respondent visited "and made inquiry[,] which didn't raise to the level of assessment." Counsel stated that the respondent had "scheduled another one for August 4, so that should be taken care of." Following the hearing, the trial judge entered a written order that indicated that the permanency goal remained "return home within 12 months." The order was silent as to whether the respondent or V.L. had made substantial progress toward the goal.

¶ 23    On October 21, 2020, Caritas filed a report that was dated October 15, 2020, and indicated that it was prepared for use at a hearing scheduled for November 4, 2020. The report indicated that the respondent still had not completed her mental health assessment, and the report again raised concerns about the children returning to the respondent's care in Kansas. The report indicated that the respondent stated that she had an appointment to get her mental health assessment, but had to cancel that appointment due to work, but now had a new appointment scheduled for October 20,

10

2020. The report noted that "Mental Health has been in [the respondent's] service plan since 11/28/18."

¶ 24    At the November 4, 2020, hearing, which also was held via Zoom, counsel for the respondent stated that the respondent had attended her October 20, 2020, mental health assessment, but that "[a]pparently, she needs another follow-up visit or follow up to complete that evaluation." Counsel further stated that "we're kind of waiting on the mental health assessment to come back to see if there is any recommendations from that." The GAL and the State both expressed concerns about the lack of progress on the part of both parents, as well as the respondent's ability to take care of the children and their many special needs if the children were sent to her in Kansas.

¶ 25    On January 19, 2021, Caritas filed a report that indicated that it was prepared for use at a hearing scheduled for February 3, 2021. The report indicated that Caritas had not been able to make contact with the respondent since October 28, 2020, either by phone or email. The report indicated that the respondent attended her mental health assessment appointment on October 20, 2020, but that therapist Kelly Ferguson of SEK Mental Health told Caritas that the respondent "would not disclose information throughout the intake assessment," and that accordingly, "there was not much [Ferguson] could do on assessing whether [the respondent] needed further treatment because [the respondent] would not disclose information." The report also indicated that following a home visit to the respondent's home on October 23, 2020, there were "many concerns," including issues regarding the cleanliness of the home, as well as "a backlog of laundry," issues regarding the number of children living in the home, and issues regarding how the children were being disciplined in the home. A summary at the end of the report stated, *inter alia*, that "[a]t this time, the progress has not been made by either parent to support a rating of satisfactory for the service plan," and that "[t]he agency is in the process of filing for legal screening."

¶ 26    On January 21, 2021, a DCFS family service plan dated October 29, 2020, was filed. The plan noted, *inter alia*, that the respondent needed to complete mental health services. The plan rated the respondent's progress as unsatisfactory with regard to participating in a mental health assessment and following recommendations. The plan indicated that the respondent would "need to disclose information in order for an accurate mental health assessment [to] be completed."

¶ 27    Thereafter, the February 3, 2021, permanency hearing, held via Zoom, was continued until February 10, 2021. At the February 10, 2021, hearing, also held via Zoom, counsel for the respondent asked if another mental health assessment was being requested, in light of the information in the Caritas report and the service plan. The Caritas caseworker present at the hearing answered, "Yes." Counsel responded, "Okay." Due to a hospitalization involving S.L., the trial judge asked the parties if they objected to the hearing being continued again. No one objected. A new hearing date of March 3, 2021, was set.

¶ 28    On March 2, 2021, Caritas filed an addendum report which included more detailed information surrounding S.L.'s psychiatric hospitalization. At the March 3, 2021, permanency hearing, held via Zoom, counsel for the respondent again asked if the respondent would "need to complete another evaluation to make sure that that's checked off her list." The Caritas caseworker present at the hearing answered, "Yes, that is correct." Counsel for the respondent then asked the caseworker if she knew if the respondent had "scheduled one or completed another one," to which the caseworker responded, "Not to my knowledge." Counsel for the State thereafter stated that, in his view, "[i]t seems like the parents are making minimal effort." The trial judge stated that although she would allow the permanency goal to remain as it was, she "obviously has concerns and questions, obviously, the validity of that goal," but that because she had "to pick from the goals that are listed in the statute," and because there was no legal screening or petition to terminate

12

rights filed, she was "left with the goal of return home." She emphasized, however, that at the next hearing, in 90 days, she wanted "to hear more about the legal screening process."

¶ 29    On May 20, 2021, Caritas filed a report that indicated that it was prepared for use at a hearing scheduled for June 2, 2021. The report indicated that Caritas had been unable to contact the respondent between October 28, 2020, and March 10, 2021. The report indicated that the respondent had gotten married and moved to Illinois on March 5, 2021, but that she was not allowed to visit with S.L. because S.L.'s mental health and behavioral problems increased after she had a phone conversation with the respondent in January 2021. The report indicated that the respondent still had not completed her mental health assessment and that she would be given a list of mental health service providers near her home in Illinois. The report stated that the respondent would have "to be willing to reengage in mental health services."

¶ 30    On June 2, 2021, the State filed petitions for termination of parental rights and for appointment of a guardian with the power to consent to the adoption of S.L. and I.L. The petitions alleged that the respondent was unfit in that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children, failed to make reasonable efforts to correct the conditions that were the basis for removal, and failed to make progress toward the return of the children during any nine-month period following adjudication (specifically from April 25, 2019, to January 25, 2020, and from January 26, 2020, to October 26, 2020).

¶ 31    On July 2, 2021, Caritas filed a report that indicated that it was prepared for use at a hearing scheduled for July 14, 2021. The report stated, with regard to the respondent's mental health services, that "[s]ince moving to Illinois, when asked about her engagement in services, [the respondent] has stated she would like to focus on her family first," and that on June 30, 2021, Caritas had asked the respondent if she had engaged in mental health services, to which the

respondent answered "that she was trying to get more hours through work currently." The report indicated that the respondent presently lived with her new husband and her four other children in a two-bedroom trailer in Salem, Illinois, and that the respondent had refused to allow a home visit on June 30, 2021.

¶ 32    At the July 14, 2021, permanency hearing, held via Zoom, counsel for the respondent claimed that the respondent "essentially" had complied with her service plans. She stated that she believed it was "still a little debatable about whether she really did disclose everything that she needed to" at the appointment for her October 20, 2020, mental health assessment. Thereafter, the trial judge ruled that she would "find that substitute care pending the Court's determination of the termination petition is in these kids' best interest," and that the respondent and V.L. had "not made reasonable progress towards the goal of return home." She ruled that the respondent had "engaged in some services but not completed all of them." After the hearing, the trial judge entered a written order in conformity with her oral rulings. Additional filings were made in support of the State's petitions.

¶ 33    A fitness hearing on the State's petitions to terminate the respondent's parental rights was held on September 15, 2021. Caitlin Joy testified that she was employed by Caritas and had previously supervised one of the caseworkers in this case. Joy testified about the creation of family service plans, which she testified are updated every six months, then verified a family service plan that was created and approved by Caritas in May 2019, for, *inter alia*, the respondent in this case. Joy testified that the plan required the respondent to, *inter alia*, "get a mental health assessment and engage in parenting classes." With regard to the mental health assessment, Joy testified that she "believe[d]" that the respondent "eventually completed that after the first six month period." Joy verified the respondent's second service plan, which began in November 2019, and testified

14

that it had the same requirements for the respondent as the first service plan had. She testified that at the time she stopped being a supervisor in this case, in February 2020, the respondent's rating was "satisfactory" because "she had complied at that time." On cross-examination, Joy agreed that the respondent received an "unsatisfactory" rating because she never provided written documentation demonstrating that she received a mental health assessment. She further agreed that she was told by a caseworker in Kansas that the respondent "had completed this mental health evaluation" and that there were no services recommended beyond the evaluation. She agreed that she needed to see "proof like the actual physical document" to verify this, and believed that the delay in getting the documentation was with the provider, not the respondent. She testified that the first service plan, although dated May 2019, actually covered the six months prior to that, meaning that it began in November 2018, when this case originated. She testified that the respondent exercised limited visitation with the children, but agreed that the respondent had transportation issues that made it difficult to come from Kansas to Illinois to visit them.

¶ 34 Krystal Foley testified that she had been a caseworker for Caritas since May 2019. She testified that during the time she was involved in this case, which was from July 2019 to March 3, 2020, the respondent did not participate in a mental health assessment. Foley testified that the respondent stated that "she couldn't do the mental health assessment because she didn't like leaving her children with other people," and that the respondent "never had an appointment for a mental health assessment when [Foley] had the case." She testified that she informed the respondent, over the phone, of the service plan's requirements. Ultimately, the respondent was rated unsatisfactory on the service plan for mental health services. Foley testified that the respondent engaged in one supervised visit with the children while Foley had the case, and that the respondent did not ever contact her to ask for more or longer visits. On cross-examination, she

15

agreed that a Kansas caseworker had told Caritas that the respondent completed a mental health assessment, but testified that no proof of that was ever received.

¶ 35    Alison Wharton[1] testified that she was a foster care case manager at Caritas, and that she was previously the caseworker for the children in this case, from August 2020 to August 2021. She testified that the respondent "had very sporadic contact throughout the entire" case, and did not visit the children at all while Wharton was the caseworker, even after the respondent moved to Illinois. She testified that the respondent contacted her to try to arrange visits once she moved to Illinois, but that Caritas determined that visits would not be in the best interest of S.L., who became very agitated after a January 2021 phone conversation with the respondent, and who was subsequently placed in a psychiatric hospital. She testified that since the respondent moved to Illinois, there had been approximately six hotline reports involving her other children who lived with her. She testified that the other children were no longer in the respondent's care. She testified that the respondent was rated as unsatisfactory on her service plans during the time Wharton was the caseworker, in part because although the respondent "did complete a mental health assessment, *** with the information she gave them they were not able to recommend further treatment or discharge her [because] [t]hey said she did not disclose information."

¶ 36    Leigh Dickey testified that she was the associate director of foster care at Caritas, and supervised caseworkers involved in this case. She verified one of the service plans in this case. Kendra Schuler testified that she was a caseworker at Caritas, and was the present caseworker for this case, having taken over the case in August 2021. She testified about interactions with the respondent and V.L. since taking over the case. Following her testimony, the trial judge admitted into evidence the first three service plans that were created in this case.

---

[1]Alison Wharton is of no relation to Justice Milton S. Wharton.

16

¶ 37    The respondent then testified. She testified that she received copies of her service plans from caseworkers, and that it was recommended that she complete a mental health evaluation. She testified that she "completed two of them." As to the first one, she testified that it was "around the end of 2018." She testified that after she could not receive documentation of the first one, she completed a second one, with a different therapist, but at the same location. She testified that she was told that the second one "was inconclusive" because the therapist believed the respondent was not "being honest." She testified that she scheduled a third mental health assessment but became ill with COVID-19 and could not complete it. She testified that it was rescheduled for September 20, 2021, five days after the present hearing. She testified that her transportation issues made it hard for her to visit the children while she was in Kansas, but that she sometimes had phone conversations with them.

¶ 38    On cross-examination, the respondent agreed that she had previously told a caseworker that she did not believe she needed a mental health evaluation. She denied that she told a caseworker in May 2020 that she had never been told that she needed a mental health evaluation. When asked if she told a caseworker that she could not attend an evaluation because she did not like leaving her children with other people, she testified that it was true that she did not like leaving them with other people, but that she did so. She agreed that she "knew throughout the entire course of this case that [she was] mandated to get a mental health evaluation." She testified that she "believe[d]" she got both evaluations in 2018. She thereafter agreed that in August 2019 she stated that one of the reasons she could not get a mental health evaluation was because she did not like leaving her children with other people, but continued to testify that she believed she completed both evaluations in 2018. She denied that she ever denied caseworkers access to her home. On

17

redirect examination, she testified that she "probably" tried to call her children on the phone "two to three times a week" after she moved to Illinois.

¶ 39    At the request of the GAL, the trial judge agreed to take judicial notice of the permanency orders that were entered on August 28, 2019, February 12, 2020, and August 3, 2020, "indicating that the services in the service plan are reasonably related to correct the conditions that brought the children into care." The GAL then recalled Alison Wharton to the stand. Wharton verified a service plan dated October 29, 2020, in which both the respondent and V.L. were rated "unsatisfactory" overall. She agreed that the service plan showed that the respondent's mental health evaluation appointment was October 20, 2020.

¶ 40    In argument, the State contended, *inter alia*, that the respondent had not maintained contact with the children, because her last visit with the children was in August 2020, had "not really wholeheartedly participated in a mental health assessment" because she was evasive during her purported second assessment and the results were therefore deemed "inconclusive," and overall her contact with the children was "rare" and "sporadic." The State added that the court "would have a better idea if she had completed these mental health evaluations as to her mind-set to the children's ability to be safe with her," but that she had "been unsuccessful every step of the way."

¶ 41    Counsel for the respondent argued that the respondent "completed really all of her services *** [a]lthough certain caseworkers may disagree." She argued that the respondent "completed a mental health evaluation" but that the providers never gave Caritas written documentation of that, and argued that the respondent completed a second evaluation, notwithstanding the fact that it was deemed to be inconclusive. She also argued that the respondent visited the children as much as she could, given her circumstances.

18

¶ 42　With regard to the respondent, the trial judge noted that she "went a year without seeing [the children] in person, which is a long, long time for kids of any age, but particularly children of this age and who have been suffering from the effects of trauma and struggling." She noted that there had been "inconsistent testimony" with regard to how much contact the respondent maintained with the children by phone. She stated that although "there was a barrier for transportation," nevertheless "going a year without seeing them is inexcusable," especially because Caritas "provided gas cards and could have been provided other assistance if she had asked. The caseworker indicated she didn't ask about other forms of transportation." The trial judge continued as follows:

> "With regard to the mental health assessment, she was rated unsatisfactory for that. It sounds like she attempted on two occasions and did have an assessment. But that assessment did not reflect what the counselor believed to be her counseling needs, therefore during the life of these cases she never received any sort of mental health counseling. Even when her children had been removed from her she didn't see them for a year. As [the GAL] indicated, surely that would have necessitated some support that mom needed by way of mental health counseling."

¶ 43　The trial judge then noted that the respondent never lived in a location where she could have taken custody of S.L. and I.L., and added that when "determining whether a parent has made reasonable progress, a Court examines the progress of a service plan, but also analyzes whether the parent is ready or near ready to take custody of their children." She stated that the respondent "was far from that *** [n]ot only in her physical environment and ability to bring these two kids, who have lots of issues, into her home *** but also with regard to her connection with them, her ability to parent them." She further stated that it would have served the family's best interests for

19

them to "have had family counseling and reunification counseling and more of a bond before the Court could have considered whether they should have been returned home to mom." She ruled "that the State has proven by clear and convincing evidence that [the respondent] is unfit for failure to make reasonable progress towards the goal of return home." She set the matter for a best interests hearing.

¶ 44    Because no issues are raised on appeal related to the best interests hearing, we need not discuss it in detail. After the hearing, on March 7, 2022, the trial judge entered orders terminating the respondent's parental rights to both S.L. and I.L. On April 1, 2022, the respondent timely appealed in both cases. On April 6, 2022, this court entered an order consolidating the appeals.

¶ 45                                    II. ANALYSIS

¶ 46    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2020); *D.T.*, 212 Ill. 2d at 352. Here, as noted above, the respondent challenges only the trial judge's finding of unfitness. She makes no argument challenging the findings at the best interest hearing. Accordingly, we consider only the trial judge's finding that the respondent was unfit. On

20

appeal, the respondent contends that finding was against the manifest weight of the evidence and must be reversed.

¶ 47    Illinois courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* A trial judge's finding of unfitness is given great deference because that judge has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented therein. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent, a trial judge's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the grounds alleged in the petition at issue. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 48    Here, the trial judge ruled that the respondent was unfit for failure to make reasonable progress towards the goal of return home during two nine-month periods following adjudication: from April 25, 2019, to January 25, 2020, and from January 26, 2020, through October 26, 2020. The respondent argues on appeal that this finding was errant because, *inter alia*, any lack of progress on her mental health assessment goal was attributable to the failure on the part of the service provider in Kansas to send documentation, not to the respondent, and that in any event,

with regard to her second mental health assessment, the fact that she "attempted" it, "notwithstanding the perception that it was not sufficient for the evaluator to provide recommendations," means that she "complied with the request" in her service plans. She also contends that there was evidence that she was scheduled for a third evaluation, and posits that "[a] parent who was not engaging and not attempting to comply with all that the agency requested of them would not have engaged in three separate evaluations." She also contends that she visited the children as much as she could, and notes that the children were removed from V.L.'s home because of conduct by V.L. and his paramour, not because of anything the respondent, who was then living in Kansas, did wrong.

¶ 49    The State counters that (1) the respondent never successfully completed a mental health assessment, (2) her housing situation was never sufficient to allow her to gain custody of the children, (3) her sporadic communication with the children, much less her infrequent visits after they were taken into care, was inadequate, and (4) she fails to acknowledge "that she basically abandoned the minors in the first place because she was unable to handle" their special needs. In support of its arguments, the State points to, *inter alia*, (1) discrepancies in the respondent's testimony regarding the mental health assessments, as well as documentation in the record that with regard to the first purported mental health assessment, the respondent met with a therapist on March 27, 2019, for an inquiry, but never completed an assessment, as conceded by the respondent's counsel at the hearing on July 29, 2020, as well as the undisputed fact that the therapist who conducted the "second" assessment opined that the respondent's failure to disclose information made it impossible for the therapist to assess her and make recommendations; (2) the fact that the trial judge was best positioned to determine the credibility of the respondent with regard to the conflicting testimony about how much contact the respondent had with the children

22

by phone, and that the record demonstrates that the trial judge was correct in her assessment that at no point since this case began has the respondent been in a situation, with regard to her housing, where she could take custody of the children; and (3) the record substantiates that the respondent relinquished custody of S.L. and I.L. to V.L. in the first place because she could not attend to their complex behavioral needs and other special needs.

¶ 50    In her reply brief, the respondent notes that the trial judge did not make any explicit findings as to credibility, and posits that the "evidence was not actually contradictory." Without citation to authority, she also claims that "[t]he judge's finding that [the respondent] never lived in a place where she could take custody of two more children is not supported by evidence absent some presentation of evidence to objectively establish what is acceptable, or legal." She reiterates her arguments in her initial brief that she should not be blamed for the misconduct of V.L. and his paramour, which is what led to the removal of the children in the first place.

¶ 51    As the parties agree, "reasonable progress" is judged using an objective standard and focuses on the amount of progress measured from the conditions existing at the time custody was taken from the parent. See, *e.g.*, *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress requires, at minimum, measurable or demonstrable movement toward the goal of reunification." *Id.* A parent's progress is measured by considering "the parent's compliance with the service plans and the court's directives in light of the conditions that led to the child's removal, and subsequent conditions that would prevent the court from returning custody of the child to the parent." *Id.* Reasonable progress will be found when a trial judge concludes that the judge will be able to order the child returned to parental custody in the "near future." *Id.*

¶ 52    In this case, the record supports, as reasonable, the trial judge's ruling that the State met its burden to prove by clear and convincing evidence that the respondent failed to make reasonable

23

progress, during the periods of time in question, towards the goal of return home, and therefore was unfit. The documentation found in the record in this case is laid out in extensive detail above. With regard to the mental health assessment, it is undisputed that the respondent has never produced written documentation that she completed the "first" mental health assessment on March 27, 2019, in Kansas, and in light of the evidence in the record—including from the respondent's own counsel at the July 29, 2020, hearing—a reasonable trial judge could have concluded that the respondent completed only an inquiry, not a full assessment, on that date, even though she was aware, by her own admission, that a full assessment was mandated by her service plan. It is also undisputed that the therapist who met with the respondent on October 20, 2020, thereafter stated that she could not determine whether the respondent needed mental health services because the respondent would not disclose information to her. Thus, a reasonable trial judge could have concluded that the respondent, due to her failure to cooperate with the therapist, did not complete this assessment either, even though the respondent was aware, by her own admission, that a complete assessment was mandated by her service plan. On the basis of the foregoing, a reasonable trial judge in turn could have concluded—particularly in light of the respondent's statements that she did not believe she needed a mental health assessment, and the other excuses she gave for why she could not complete an assessment—that the respondent never made a genuine attempt to comply with this aspect of her service plans, despite repeated opportunities to do so, and therefore failed to make reasonable progress on complying with the plans and towards the goal of return home.

¶ 53    We note as well that with regard to the trial judge's finding that the respondent never lived in a location where she could have taken custody of S.L. and I.L., this too was a reasonable finding that is supported by the evidence. The trial judge specifically noted that for there to be reasonable

24

progress, the parent must be "ready or near ready to take custody of their children," but that in this case the respondent "was far from that *** [n]ot only in her physical environment and ability to bring these two kids, who have lots of issues, into her home *** but also with regard to her connection with them, her ability to parent them." A review of the record shows that it is undisputed that although there were times that the respondent's housing situation was sufficient for her and the children who already lived with her, at no time was it sufficient to accommodate S.L. and I.L. as well, in terms of having adequate space for them, ensuring they were not cohabitating with inappropriate adults other than the respondent, and also in terms of the many special needs the children had. With regard to the respondent's "connection" to the children, a reasonable trial judge—who, as the State points out, would be best positioned to determine the credibility of the respondent with regard to the conflicting testimony about how much contact the respondent had with the children by phone—could have concluded that there simply was not a sufficiently stable connection between the respondent and the children for the judge to be able to order S.L. and I.L. to be returned to the respondent's custody in the "near future." See, *e.g.*, *Jacorey*, 2012 IL App (1st) 113427, ¶ 21. This is also true in light of the undisputed fact that the respondent at one point went a year without visiting the children in person.

¶ 54     We reiterate that a finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence, and that a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *C.N.*, 196 Ill. 2d at 208. In this case, for the reasons discussed above, there is no reasonable way to conclude that the opposite conclusion to the trial judge's finding that the State proved by clear and convincing evidence that the respondent was unfit is "clearly apparent." Accordingly, the trial judge's finding is not against the manifest weight of the evidence, and we therefore affirm it. See *id*.

¶ 55                                    III. CONCLUSION

¶ 56    For the foregoing reasons, the orders of the circuit court of Marion County that terminated

the respondent's parental rights as to S.L. and I.L. are affirmed.


¶ 57    Affirmed.